## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

DR. JOHN SPORE and CHERYL SPORE,

     Plaintiffs,

     v.

BAXTER HEALTHCARE
CORPORATION and BAXTER
INTERNATIONAL INC.,

     Defendants.

Case No. 3:22-cv-03059-TLB

DEMAND FOR JURY TRIAL

## FIRST AMENDED COMPLAINT

Plaintiffs Dr. John and Cheryl Spore file this First Amended Complaint against defendants Baxter Healthcare Corporation ("Baxter Health") and Baxter International Inc. ("Baxter International") (jointly "Baxter" or "Defendants") and allege as follows:

### INTRODUCTION

1. Baxter International, through its wholly owned subsidiary Baxter Health, manages and operates an industrial medical sterilization plant in Mountain Home, Arkansas (the "Industrial Plant"). As part of its sterilization process, Baxter's Industrial Plant has emitted into the air hundreds of thousands of pounds of ethylene oxide ("EtO"), an odorless, colorless, and highly carcinogenic gas.

2. Plaintiffs are innocent bystanders who live adjacent to Baxter's Industrial Plant and for decades have been exposed to EtO in the air they breathe each day.

3. Although EtO has been classified as a human carcinogen, Baxter disregarded EtO's harmful properties and continued, and continues, to release it into the surrounding community—entirely unbeknownst to area residents and workers.

4. Self-reported emissions from the Industrial Plant show Baxter's Industrial  Plant has emitted high levels of EtO for decades. While some of these EtO omissions are from controlled sources, the largest number of these emissions are "fugitive emissions" that have been escaping, and continue to escape, the Industrial Plant.

5. As a result, and unbeknownst to them, individuals living and working near the Industrial Plant face some of the highest long-term cancer risks in the United States. These individuals, including Plaintiffs, have been unknowingly inhaling EtO on a routine and continuous basis for decades.

**PARTIES**

6. Plaintiff Dr. John Spore is a natural person and a citizen of the State of Arkansas.

7. Plaintiff Cheryl Spore is a natural person and a citizen of the State of Arkansas.

8. Plaintiffs have been married for more than 40 years. They are the parents of four children and the proud grandparents of 12 grandchildren.

9. Defendant Baxter Healthcare Corporation is a corporation organized and existing under the laws of Delaware with its principal place of business located at One Baxter Parkway, Deerfield, Illinois 60015. Defendant Baxter Healthcare Corporation was known as Travenol Laboratories, Inc. until approximately 1987.

10. Defendant Baxter International Inc. is a publicly traded company (NYSE: BAX) organized and existing under the laws of Delaware with its principal place of business located at One Baxter Parkway, Deerfield, Illinois 60015. Defendant Baxter International Inc. is the parent company of Baxter Healthcare Corporation.[1] Until approximately 1988, Baxter International Inc. was known as Baxter Travenol Laboratories, Inc.

11. As it provides in its SEC filings, "Baxter International Inc., through its subsidiaries, provides a broad spectrum of essential healthcare products … As of December 31, 2021, we[2] manufactured products in over 20 countries and sold them in over 100 countries."[3]

12. Baxter International's SEC filing describes the Industrial Plant as "our facility."[4] *See* 10-K at p. 12.

13. Baxter International owns or has a long-term lease on all of its manufacturing facilities including the Industrial Plant.[5]

---

[1] *See* SEC Filings, Baxter International Inc., Annual Report (Form 10-K) (Feb. 23, 2022) at Exhibit 21.

[2] Baxter International's most recent Annual Report (Form 10-K) says it uses the terms "we," "our" or "us" means Baxter International and its consolidated subsidiaries, unless the context otherwise requires." *Id.* at p. 1.

[3] *See id.* at p. 1.

[4] *Id.* at p. 12.

[5] *See id.* at p. 21.

14. Baxter International provides management support for the Industrial Plant.[6]

15. For example, Baxter International provides litigation support related to the Industrial Plant.[7]

16. Baxter International also provides compliance services related to the Industrial Plant.

17. For example, Baxter International has provided air submissions for the Industrial Plant to the Arkansas Department of Environmental Quality.

18. Baxter International also worked to ensure compliance with the various provisions of the Consent Orders related to the Industrial Plant, including monitoring EtO emissions from the Industrial Plant, reporting emission information to the Arkansas Department of Environmental Quality, and working to develop alleged changes related to EtO emission from the Industrial Plant.

19. Thus, Baxter International is substantially involved with the operations of Baxter Healthcare as it relates to the Industrial Plant, including assuming responsibility for communications regarding EtO and compliance issues related to the Arkansas Department of Environmental Quality and has been independently involved as it relates to emissions, monitoring, and reporting of EtO from the Industrial Plant.

---

[6] *See id.* ("We manage our global operations based on four segments, consisting of the following geographic segments related to our legacy Baxter business…").

[7] *See* Case: 1:20-cv-01652 at Dkt. 19-1, Declaration of Sarah M. Padgitt, Associate General Counsel of Baxter International declaring "I manage litigation and the response to discovery requests related to Baxter" in action involving the Industrial Plant.

20. Baxter International has thus undertaken to involve itself, affirmatively, in directing what measures should, or should not, be taken related to EtO and the Industrial Plant.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because (i) the parties are citizens of different states, and (ii) the amount in controversy exceeds $75,000.

22. This Court has personal jurisdiction over defendant Baxter Healthcare Corporation because it is registered to do business in this District and carries on a continuous and systematic part of its business throughout this District.

23. This Court has personal jurisdiction over defendant Baxter International Inc. because it conducts significant business in this District. It derives substantial revenue from goods used and services performed in this District. It expected its acts to have consequences within the State of Arkansas and derived substantial revenue from interstate commerce. Baxter International Inc. purposefully availed itself of the privilege of conducting activities within the State of Arkansas, thus invoking the benefits and protections of its laws.

24. Venue is proper in this District because Defendants' Industrial Plant is located in this District and Defendants' actions caused harm to Plaintiffs within this District.

FACTUAL ALLEGATIONS

I.   **The Ethylene Oxide Sterilization Process and Resulting Emissions of Carcinogenic Ethylene Oxide**

25. EtO is a colorless, odorless, and flammable gas at room temperature that is produced and used in large volumes for industrial uses.[8]

26. Gaseous EtO is used to sterilize devices that cannot be sterilized using steam or radiation, such as medical and dental equipment.

27. According to the Environmental Protection Agency ("EPA"), EtO is currently used to treat approximately 50% of sterile medical devices, about 20 billion devices annually.[9]

28. The first step in EtO sterilization is environmental conditioning. In this conditioning process, the products to be sterilized are typically placed in a specially designed room to heat and humidify the products. After this is complete, the products are placed in the sterilization chamber.

29. The second step in the EtO sterilization process is initial evacuation of the sterilization chamber. In this step, the majority of the ambient air is removed from the sterilization chamber. There are two typical methods to evacuate the ambient air: (1)

---

[8]   https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/ethylene-oxide.

[9] EPA Press Office, *EPA Launches Community Engagement Efforts on New Ethylene Oxide Risk Information*, EPA, Aug. 3, 2022, https://www.epa.gov/newsreleases/epa-launches-community-engagement-efforts-new-ethylene-oxide-risk-information#:~:text=According%20to%20the%20Food%20and,currently%20available%20for%20some%20devices.

evacuating out all the ambient air in one action, known as a "deep vacuum,"[10] and (2) a series of partial vacuums, followed by a series of nitrogen injections. Either of these processes is designed to purge (remove) the ambient air.

30. The third step in the EtO sterilization process is humidification of the sterilization chamber. This step allows the EtO to properly adhere to the products to be sterilized. When air is evacuated from the chamber, moisture from the air is also lost. This moisture must be replaced to ensure the efficacy of the sterilization. Moisture is reintroduced through steam injections. The amount of steam required is calculated to yield a predetermined relative humidity. After steam is introduced, the products are allowed to dwell, or soak, for the amount of time required to replace the moisture lost from the evacuation phase.

31. The fourth step in the EtO sterilization process is gas injection and gas dwell. Liquid EtO is heated into a gaseous phase, then injected into the sterilization chamber. The length of time and the amount of time the EtO is left in the sterilization chamber typically varies based on the products to be sterilized and the size of the sterilization chamber, among other potential factors.

32. The fifth step in the EtO sterilization process is to remove the EtO from the sterilization chamber and reintroduce ambient air. Removal of all the EtO is neither

---

[10] Defendants use the first method, "deep vacuum," given that their permits do not reveal any nitrogen injection equipment necessary to evacuate using the second method.

required nor feasible, rather, typically enough of the EtO must be removed to ensure the levels fall below the flammable limit for EtO. Removal is typically accomplished by performing a series of post-vacuums. An inert gas, sometimes nitrogen, may then be reintroduced into the sterilization chamber.

33. The sterilized products are then typically moved from the sterilization chamber to an aeration room. After sterilization, EtO remains on and around the products. In the aeration room, heat is added to help facilitate off-gassing of EtO.

34. Finally, after aeration, the products are moved to the warehouse for storage until they are released and picked up to be transported.

35. Throughout the sterilization process, there are multiple sources of EtO emissions.

36. First, the EtO that is removed from the sterilization chamber is typically pulled through the stack and then released into the atmosphere surrounding that facility. These are known as stack emissions. Some medical sterilization facilities use scrubbers designed to reduce the amount of EtO that is then emitted into the air surrounding the medical sterilization facility. Scrubbers, however, are not able to remove or convert all of the EtO. Baxter uses inadequate scrubbers at the Industrial Plant which results in excessive EtO being emitted into the air surrounding the Industrial Plant.

37. The second type of emissions are fugitive emissions. The Clean Air Act Amendments of 1977 defines fugitive emissions as emissions from a facility that escape from anywhere other than a point source (or a stack emission). 42 U.S.C.A. § 7602(j).

38. There are multiple sources of fugitive EtO emissions. Fugitive EtO emissions at sterilization facilities generally occur from (1) off-gassing associated with the handling of EtO before beginning the sterilization process in the sterilization chamber; (2) off-gassing of a sterilized product after that product is transferred from the sterilization chamber to the aeration room; (3) off-gassing from uncontrolled and under-controlled aeration rooms; and (4) any off-gassing that may occur after a product is removed from the aeration room.[11]

39. In addition, because not all the EtO is removed from the sterilization chamber after the sterilization process is complete, the remaining EtO may also escape the medical sterilization facility and leak into the surrounding air.

40. Like stack emissions, when fugitive emissions escape into the air, they can cause grave health concerns for workers in the facilities and individuals living or working near the medical sterilization facility emitting fugitive emissions.

## II.    Ethylene Oxide Drifts After It Is Emitted into the Air

---

[11] National Emissions Standards for Hazardous Air Pollutants: Ethylene Oxide Commercial Sterilization and Fumigation Operations, 84 Fed. Reg. 67889 (proposed December 12, 2019) (to be codified at 40 C.F.R. 63).

41. EtO is a gas at room temperature. Thus, when EtO is released into the air, it will exist solely as a gas in the atmosphere until it is broken down.[12]

42. EtO can have a half-life of 69 days during summer months and 149 days during winter months.[13] This means half of the EtO emitted from the Industrial Plant, will still be in the air for months. The amount of EtO in the air may continue to accumulate as EtO is continuously emitted from the Industrial Plant.

43. Once EtO is released into the air, it can be moved around by the wind until it ultimately breaks down.

44. EtO that is deposited on soil may later volatilize, or pick up and move, back into the air. The half life of EtO from wet soil may range from six hours to four days. EtO can also remain on water for many days.[14]

45. Further, because of EtO's molecular weight, it can collect, or accumulate, around ground level. When there are calm meteorological conditions, temperature inversions can

---

[12] *See* National Library of Medicine, National Center for Biotechnology Information. Compound Summary-Ethylene Oxide. Available online: https://pubchem.ncbi.nlm.nih.gov/compound/6354#section=ICSC-Environmental-Data (accessed on October 13, 2022).

[13] Szwiec, et al., *Levels of Ethylene Oxide Biomarker in an Exposed Residential Community*, Intl. J. Environ. Res. Public Health 2020, 17, 846.

[14] *Id.*

occur further allowing EtO to become trapped and "hover" near the ground rather than being disbursed further from the Industrial Plant by the wind.[15]

46. The National Air Toxics Assessment has conducted ambient air monitoring of EtO around medical sterilization facilities and around locations without facilities.[16] These studies show that EtO levels are higher around medical sterilization facilities and that EtO moves through the air away from the medical sterilization facilities after it is emitted.

47. EPA has also conducted air monitoring and modeling for eight locations near specific sources of EtO emissions. Those studies found higher levels of EtO approximately one mile from the medical sterilization facility compared to expected background levels of EtO.[17]

---

[15] *See Letter Health Consultation: Evaluation of Potential Health Impacts from Ethylene Oxide Emissions*. Agency for Toxic Substances and Disease Registry. Available online: https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf (reporting on air monitoring next to Illinois medical sterilization facility and finding 12-hour samples had higher levels of EtO than single "grab" samples, which was likely attributable to 24-hour run by facility allowing EtO to accumulate near the ground and be impacted by a temperature inversion). Upon information and belief, the Mountain Home Industrial Plant is also a 24-hour operation.

[16] National Toxicology Program. Ethylene Oxide, Report on Carcinogens, Fifteenth Ed., Dec. 21, 2021, available at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf.

[17] *Id.*

48. For example, in 2018 EPA measured air concentrations of EtO around two medical sterilization facilities in Illinois.[18] That study found EtO one mile or more away from the medical sterilization facilities.

49. A study of blood samples from residents living around the same Illinois medical sterilization facilities found the presence of EtO in increasing amounts the closer people lived near those facilities.[19]

**III.    Health Effects of Ethylene Oxide Exposure**

50. For nearly half a century, global health organizations have expressed concerns about the adverse health effects associated with EtO exposure, including the risk of developing various cancers, including blood, lymphoid, and breast cancers.

51. In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") raised concerns that EtO may be a carcinogen and concluded that occupational exposure to EtO may increase the frequency of genetic mutations in humans.[20]

---

[18] *Letter Health Consultation: Evaluation of Potential Health Impacts from Ethylene Oxide Emissions*. Agency for Toxic Substances and Disease Registry. Available online: https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf.

[19]  Szwiec, et al., *Levels of Ethylene Oxide Biomarker in an Exposed Residential Community*, Intl. J. Environ. Res. Public Health 2020, 17, 846.

[20] *Special Occupational Hazard Review with Control Recommendations: Use of Ethylene Oxide as a Sterilant in Medical Facilities*, NIOSH, August 1977, https://www.cdc.gov/niosh/docs/77-200/.

52. In 1981, NIOSH released a subsequent report that recommended that EtO be regarded in the workplace as a potential occupational carcinogen.[21] NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and studies showing an increased cancer risk.

53. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.[22]

54. The 1990 revision of the U.S. Clean Air Act ("CAA") included EtO as a Hazardous Air Pollutant ("HAP") in Section 112(d).

55. The International Agency for Research on Cancer ("IARC") is an agency that studies the risks of cancer associated with various chemicals for the World Health Organization ("WHO").[23]

56. IARC employs a stratified system to rank the risk of cancer associated with a given chemical. This system breaks the risk groups into different tiers:

> **Group 1** (carcinogenic to humans);

---

[21] *Ethylene Oxide (EtO): Evidence of Carcinogenicity*, NIOSH, May 1981, https://www.cdc.gov/niosh/docs/81-130/.

[22] Fourth Annual Report on Carcinogens, Public Health Service (1985), Report No. NIOSH00171634.

[23] IARC's Mission: Cancer Research for Cancer Prevention, International Agency for Research on Cancer, https://www.iarc.who.int/about-iarc-mission/.

**Group 2A** (probably carcinogenic to humans);

**Group 2B** (possibly carcinogenic to humans);

**Group 3** (not classifiable as to its carcinogenicity to humans); and

**Group 4** (probably not carcinogenic to humans).[24]

57. Since at least 1994, IARC has considered EtO to be in the highest risk category: Group 1 (carcinogenic to humans).[25]

58. In 2000, the National Toxicology Program listed EtO as a known human carcinogen.[26]

59. In 2004, NIOSH published a large epidemiological study of EtO, which analyzed over 18,000 employees who worked with EtO at multiple facilities that sterilized medical equipment and spices.[27] That study found a link between EtO exposure and increased cases of cancer, including lymphoid cancers in males (i.e. myeloma, lymphocytic leukemia, and non-Hodgkin lymphoma).

---

[24] Agents Classified by the IARC Monographs, Volumes 1-132, International Agency for Research on Cancer, https://monographs.iarc.who.int/agents-classified-by-the-iarc/.

[25] *Id.*

[26] *See, e.g.*, National Toxicology Program. Ethylene Oxide, Report on Carcinogens, Fourteenth Ed., Nov. 3, 2016, available at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf.

[27] Worker Health Study Summaries – Ethylene Oxide, NIOSH, April 2004, https://www.cdc.gov/niosh/pgms/worknotify/ethyleneoxide.html.

60. In December 2016, EPA reclassified ethylene oxide from a "probable cancer-causing" agent to a "known carcinogen," and found that it was 30 times more carcinogenic than previously considered. In particular, EPA noted the risk of lymphoid cancers in males, including myeloma.

61. EPA has determined that EtO is carcinogenic to humans by the inhalation route of exposure.[28]

62. Human exposure to EtO through inhalation significantly increases the risk of developing various forms of cancers of the blood, including non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia.[29]

63. In 2019, the Illinois Department of Public Health ("IDPH") assessed cancer rates in the population surrounding the Sterigenics medical sterilization facility in Willowbrook, Illinois,[30] located approximately 33 miles from Baxter's corporate

---

[28] Leighton, et al., *Ethylene Oxide (EtO). Draft Human Health and Ecological Risk Assessment in Support of Registration Review*, EPA, Nov. 3, 2020, https://www.epa.gov/sites/default/files/2020-11/documents/d458706-eto-final-dra-nov-3-2020.pdf.

[29] *Frequent Questions about Ethylene Oxide*, Environmental Protection Agency, https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-about-ethylene-oxide-eto.

[30] Cancer Incidence Assessment near Sterigenics in Willowbrook, IL, 1995-2015, Illinois Department of Public Health, Division of Epidemiological Studies (March 29, 2019), https://dph.illinois.gov/content/dam/soi/en/web/idph/files/publications/sterigenicswillowbrookcancer-investigation-final-0.pdf. That facility emitting between 17,000 and 33,000 pounds of EtO annually before 1999 and about 5,000 pounds annually since 1999.

headquarters. The Sterigenics facility had been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirmed decades of studies on EtO exposure. The IDPH found elevated cases of lymphohematopoietic, breast, and other cancers, including prostate, pancreatic, ovarian, and bladder cancers. That study further found an increase in certain pediatric cancers.

64. Also in 2019, after the EPA found that the largest sterilization facility in Michigan imposed an additional cancer risk greater than 1 in 1,000 thousand in nearby neighborhoods, the Michigan Department of Environmental Quality (now referred to as the Department of Environment, Great Lakes, and Energy) conducted an air quality modeling study to study the ambient EtO impacts of the sterilization facility.[31] The study found that the estimated peak 24 hour exposure to EtO caused by the sterilization facility corresponded to an additional cancer risk of approximately one in one hundred. [32]

**IV.     Regulation of Ethylene Oxide Sterilization Facilities**

65. The Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, is the primary mechanism through which the federal government regulates air emissions from industrial facilities that emit hazardous air pollutants in the United States. The CAA requires EPA to identify sources

---

[31] Olaguer, et al, *Ethylene Oxide Exposure Attribution and Emissions Quantification Based on Ambient Air Measurements near a Sterilization Facility*, Int. J. Eviron. Res. Public Health, 17(1), 42, https://doi.org/10.3390/ijerph17010042.

[32] *Id.*

of and set national emission standards for a specific list of nearly 200 hazardous air pollutants.[33]

66. The emission standards, known as National Emission Standards for Hazardous Air Pollutants ("NESHAP"), are directly apply to facilities such as the Industrial Plant and are enforceable by EPA.[34]

67. In 1994, NESHAP established by the CAA subjected EtO to a Maximum Achievable Control Technology ("MACT") standard, as well as a subsequent Risk and Technology Review to determine whether additional controls at regulated facilities were necessary to reduce unacceptable residual risk.

68. The CAA also creates a nationally uniform system of permits, known as "Title V permits," for major industrial sources.[35] EPA sets the substantive requirements for the Title V permitting program. It also has the power to authorize individual states to administer the permitting program on EPA's behalf.[36] EPA approved Arkansas'

---

[33] 42 U.S.C. § 7412.

[34] 40 C.F.R. § 63.368.

[35] 40 C.F.R. § 70.1.

[36] 40 C.F.R. §§ 70 *et seq*.

Department of Environmental Quality ("ARDEQ") Operating Permits program on December 10, 2001.[37]

69. Baxter's Industrial Plant is subject to the Ethylene Oxide Emission Standards for Sterilization Facilities, 40 C.F.R. Part 63, Subpart O, which requires Baxter's Industrial Plant to reduce EtO emissions to the atmosphere from each aeration room vent to a maximum concentration of 1 part per million by volume (ppmv) or by at least 99%, whichever is less stringent and 99% emissions reduction for each sterilization chamber vent.

70. In December 2019, EPA published Advanced Notice of Rulemaking for Ethylene Oxide Sterilization and Fumigation Operations. These proposed regulations are intended to significantly restrict emissions of EtO in light of the widely accepted understanding that EtO causes cancer.

**V. Baxter's Mountain Home Industrial Plant**

71. Baxter opened its 660,000 square feet Mountain Home, Arkansas Industrial Plant in 1964.[38] The Industrial Plant is located at 1900 Highway 201 North, Mountain Home, Arkansas, 72653.

_____

[37] CAA Full Approval of Operating Permits Program and Approval and Promulgation of Implementation Plans; State of Arkansas; New Source Review (NSR), 66 Fed. Reg. 51312. (Dec. 10, 2001).

[38] *Baxter Mountain Home: A Small-Town's Claim to World Class Fame*, Manufacturing.net, Oct. 9, 2011, at https://www.manufacturing.net/home/article/13217674/baxter-mountain-homea-smalltowns-claim-to-worldclass-fame.

72. The Industrial Plant currently operates six EtO gas sterilization chambers; there are two 1,330 cubic feet chambers and four 667 cubic feet chambers.

73. In 1978, Baxter Healthcare was issued its first air permit #530-A, which permitted the installation of three boilers. These boilers are used to produce steam needed for the sterilization process.

74. Also in 1978, Baxter Healthcare was permitted to construct three sterilization chambers using EtO as a sterilization agent under permit #544-A.

75. In its 1978 permit application, Baxter Healthcare stated its projected EtO emissions would be 90 pounds per day or a maximum of 32,750 pounds per year.

76. In a May 22, 1978 letter to the Arkansas Department of Pollution Control & Ecology, Baxter Healthcare claimed that EtO's benefits vastly outweighed the risks associated with EtO exposure and would not be implementing any measures to control the release of EtO into the environment. In particular, Baxter Healthcare stated, "[t]he overwhelming benefits to the public in having available sterile medical devices far outweighs any minimal risk associated with the use of ETO." When discussing "Control Equipment," Baxter Healthcare falsely stated, "[d]evices for controlling Ethylene Oxide are either unavailable, marginally effective, or not economically feasible at the present time."

77. In 1984, Baxter Healthcare installed scrubbers in a California sterilization facility to control emissions from that facility. Baxter Healthcare claimed it was "very concerned

19

with being environmentally conscientious … and ha[s] spent a great deal of time and money to that end." Baxter Healthcare was not concerned with being "environmentally conscious" when using EtO in Arkansas, the Natural State.[39]

78. In 1986, the first consolidated permit #544-AR-3 was issued for the Industrial Plant that permitted Baxter Healthcare to install and operate a ten-place ethylene oxide sterilizer. By that time, four chambers were operated at the Industrial Plant, and one more chamber was permitted.

79. In 1990, permit #544-AR-6 was issued, permitting Baxter Healthcare to install a scrubber to the ethylene sterilization system. One specific condition of permit #544-AR-6 limited Baxter Healthcare to only route EtO from the sterilization chambers to any stack other than SN-58, the sole scrubber tower at the Industrial Plant. The maximum EtO emissions from the scrubber tower was limited to 18.22 tons per year, which Baxter Healthcare claimed would be a reduction of 69-79%. Any breach of this condition was considered an "upset condition" and would subject Baxter Healthcare to possible enforcement action by the State of Arkansas. Thus, Baxter Healthcare's permit did not permit emissions of EtO except through the scrubber. Baxter Healthcare's own reported emissions, however, demonstrate fugitive emissions, *i.e.*, those that were not emitted from the stack and thus not through the scrubber.

---

[39] *4 Sterilization Firms Sued on Emissions of Carcinogenic Gas*, LA Times, July 19, 1990.

80. Baxter Healthcare was issued permit #544-AR-9 on September 18, 1996. Permit #544-AR-9 contained the express condition that "[r]outing ethylene oxide to any stack except the scrubber tower (including maintenance periods) shall be considered an upset condition." The permit further mandated that "Baxter shall not exceed [use] 48,000 lb/month nor 576,000 lb/yr of ethylene oxide." Lastly, Baxter Healthcare was mandated to keep records of EtO utilization on site and update those records monthly.

81. On June 17, 1999, the ARDEQ issued Operating Air Permit No. 544-AOP-RO to Baxter Healthcare, its first Title V permit, for its operations at its Industrial Plant. This permit set the Industrial Plant's maximum EtO emissions at 13.33 pounds per hour or 8.5 tons per year.[40] Additionally, Operating Air Permit No. 544-AOP-RO conditioned the Industrial Plant's emission of EtO "<u>only</u> as a result of emergency or upset conditions" (emphasis in original).[41] As Baxter Healthcare explained in its permit, however, up to 95% of the EtO could be pulled from the sterilization chamber. That EtO was allegedly scrubbed to remove more than 99% of the EtO from the chamber. At the same time the sterilization door was opened, though, the remaining EtO was pulled out of rear vents. EtO pulled from those vents was not controlled, *i.e.* were fugitive emissions. These

---

[40] Operating Air Permit No. 544-AOP-RO at 11. While Baxter Healthcare and Baxter International have claimed they have always been in compliance with Baxter Healthcare's permits, that is false. Further, Baxter has not demonstrated compliance with the hourly limitations on its emissions.

[41] *Id.*

emissions can be seen in Baxter Healthcare's emission data, including the more than 20,000 pounds of fugitive emissions reported from 1995-1999.

82. In 2002, Baxter Healthcare was issued OAR No. 544-AOP-R1, which further reduced Baxter Healthcare's permitted EtO output to 1.63 tons per year. In addition to the permitted EtO output through its scrubber, approximately an additional 5% of the EtO used in the sterilization chambers was to be exhausted through the rear of the chambers as fugitive emissions into the atmosphere.[42]

83. Permit #544-AOP-R3 was a minor modification issued on November 12, 2003 to allow Baxter Healthcare an alternative evacuation process for the EtO sterilization chambers. This alternative evacuation method allowed Baxter Healthcare the option of using vacuum pumps or steam ejectors to evacuate the chambers during the initial and the after-gassing portions of the EtO sterilization cycle. This modification did not change any permitted emission limits.

---

[42] Permit #544-AOP-R1 describes the process as follows: "At the end of the sterilization cycle, a maximum of 95% of ethylene oxide is pulled out by vacuum pumps and routed to the scrubber. … After ethylene oxide is evacuated from the chamber, the chamber's front door is opened to remove sterilized product. Simultaneously, the rear chamber exhaust vent starts pulling air and remaining ethylene oxide from the chamber. Currently, rear chamber exhausts vent to the atmosphere as SN-78 through SN-83. … Currently emissions from the rear chamber exhaust vents (SN-78 through SN-83) are not controlled."

22

84. Starting in 2015, with permit #544-AR-12, the Industrial Plant was no longer permitted to allow uncontrolled emissions from the rear air evacuation pulled from the medical sterilization chamber.

## V.    Baxter's Reported Ethylene Oxide Emissions and Permit Violations

85. The following chart summarizes Baxter Healthcare's reported releases of EtO into the air surrounding the Industrial Plant, as was reported to the Environmental Protection Agency[43]:

| Year | Fugitive Air (lbs) | Stack Air (lbs) | Total Air (lbs) |
|------|-------------------|-----------------|-----------------|
| 1987 | 1278 | 127,792 | 129,070 |
| 1988 | 900 | 96,100 | 97,000 |
| 1989 | 1,100 | 100,000 | 101,100 |
| 1990 | 1,300 | 110,000 | 111,300 |
| 1991 | 7,400 | 1,500 | 8,900 |
| 1992 | 9,000 | 2,000 | 11,000 |
| 1993 | 9,000 | 2,000 | 11,000 |
| 1994 | 8,000 | 2,000 | 10,000 |
| 1995 | 21,000 | 2,000 | 23,000 |
| 1996 | 20,000 | 1,000 | 21,000 |
| 1997 | 22,000 | 1,600 | 23,600 |
| 1998 | 22,000 | 300 | 22,300 |
| 1999 | 21,000 | 400 | 21,400 |
| 2000 | 0 | 2,000 | 2,000 |
| 2001 | 0 | 1,700 | 1,700 |
| 2002 | 250 | 1,700 | 1,950 |
| 2003 | 40 | 1,700 | 1,740 |
| 2004 | 250 | 1,700 | 1,950 |
| 2005 | 250 | 467 | 717 |

---

[43]   TRI Facility Report, Environmental Protection Agency (Sept. 28, 2022), https://enviro.epa.gov/facts/tri/ef-facilities/#/Facility/72653BXTRH1900N.

| 2006 | 250 | 386 | 636 |
|---|---|---|---|
| 2007 | 250 | 400 | 650 |
| 2008 | 250 | 450 | 700 |
| 2009 | 250 | 470 | 720 |
| 2010 | 250 | 510 | 760 |
| 2011 | 250 | 550 | 800 |
| 2012 | 250 | 580 | 830 |
| 2013 | 250 | 700 | 950 |
| 2014 | 250 | 700 | 950 |
| 2015 | 1,600 | 4,700 | 6,300 |
| 2016 | 1,800 | 5,000 | 6,800 |
| 2017 | 1,800 | 5,100 | 6,900 |
| 2018 | 1,900 | 5,600 | 7,500 |
| 2019 | 2,000 | 7,400 | 9,400 |
| 2020 | 2,100 | 5,800 | 7,900 |
| 2021 | 2,100 | 610 | 2,710 |

86. In a 2001 interview, Baxter Healthcare's Mountain Home Environmental Administrator, Carolyn Walker, acknowledged the amount of EtO the Industrial Plant used per year and the problems associated with containing it, stating, "[w]e use 200,000 lbs. of ethylene oxide in a year to sterilize products, and our challenge is to reduce air emissions from this gas to less than one part per million coming out of the stack."[44]

87. Baxter Healthcare cannot seriously contend it has risen to the challenge. First, neither Baxter Healthcare nor Baxter International invested reasonable funds to control EtO emissions from the Industrial Plant until 2020. Since that time, Baxter Healthcare and/or Baxter International has installed equipment that would help mitigate EtO

---

[44] *Baxter Mountain Home: A Small-Town's Claim to World Class Fame*, Manufacturing.Net (Oct. 9, 2001), https://www.manufacturing.net/home/article/13217674/baxter-mountain-homea-smalltowns-claim-to-worldclass-fame.

emissions from the Industrial Plant. Neither Baxter Healthcare nor Baxter International have offered no justification why it could not have installed this equipment between 1988 and 2020 when Plaintiffs were exposed to the EtO Baxter's Industrial Plant emitted to mitigate the harm Plaintiffs have suffered.

88. Further since 2020, Baxter's Industrial Plant has been subject to two informal enforcement actions (2020 and 2022) and one formal enforcement action (2021) by the State of Arkansas resulting in $8,400 in penalties.

89. In June 2020, ARDEQ sent Baxter Healthcare a formal enforcement letter because of compliance issues identified in February and April 2020.

90. In May 2021, Baxter Healthcare entered into a Consent Administrative Order with the Arkansas Department of Energy and Environment, Division of Air Quality. In that Consent Administrative Order, Baxter Healthcare revealed that in February 2020 it initiated "voluntary" emissions testing of certain emissions. Those tests showed Baxter Healthcare was in violation of its emissions permit and therefore in violation of Ark. Code Ann. § 8-4-217(a)(3). Baxter Healthcare admitted to exceeding the 0.184 pounds per hour EtO emission rate limit for its two catalytic oxidizers.[45] In fact, the Emission Exceedance Report from February 11, 2020, submitted by Baxter Healthcare, indicated that one of the catalytic oxidizers in use at the Industrial Plant recorded an emission rate of 2.1 pounds

---

[45] *In re the Matter of Baxter Healthcare Corporation*, LIS No. 21-037 (Ark. Dep't of Energy and Env't, Div. of Env't Quality May 5, 2021).

per hour or **eleven times the maximum allowed** emission rate. The other catalytic oxidizer recorded an emission rate as high as 1.3 pounds per hour, or **seven times the maximum emission rate**.[46]

91. In April 2020, Baxter Healthcare admitted it conducted further "voluntary" emissions testing. Those emissions were up to 2.5 times the allowed hourly emissions and therefore violated Ark. Code Ann. § 8-4-217(a)(3). Baxter Healthcare submitted another Emission Exceedance Report on April 23, 2020, notifying the ARDEQ that it had detected elevated levels of emissions that occurred on April 15 and April 16, 2020. Baxter Healthcare's EtO emissions rates over the two days averaged 0.99 pounds per hour to 1.8 pounds per hour, several times higher than the maximum allowable emission rate of 0.68 pounds per hour.[47]

92. Baxter Healthcare also admitted it had additional, uncontrolled fugitive emissions, including emissions from indoor areas between the sterilization chambers and aeration rooms that had not previously been accounted for and for which Baxter Healthcare made no effort to control.

93. As part of its Consent Administrative Order with the ARDEQ, Baxter Healthcare agreed to provide a written Work Plan to reduce its EtO emissions. The Work Plan had to include the following:

---

[46] *Id.*

[47] *Id.*

a. Reduction of the amount of EtO used in the sterilization cycles at the Industrial Plant;

b. The implementation of controls that achieve at least a 99.9% destruction efficiency at SN-101(ethylene oxide absorber tower), SN-116 (catalytic oxidizer 1), SN-117 (catalytic oxidizer 2), and at least 99% destruction efficiency at SN-119 (sterilization chamber) and proposed SN-123 (regenerative thermal oxidizer) control equipment;

c. Reduction in the amount of fugitive EtO emissions and the enhancement in the capture of fugitive EtO emissions, including the proposed SN-123 (regenerative thermal oxidizer), with the goal of achieving 100% capture to the extent possible as determined by EPA Method 204 and the goal of achieving at least 99% control efficiency to the extent possible from SN-123 (regenerative thermal oxidizer);

d. Monitoring of EtO sources SN-101 (ethylene oxide absorber tower), SN-116 (catalytic oxidizer 1), SN-117 (catalytic oxidizer 2), SN-119 (sterilization chamber) and the proposed SN-123 (regenerative thermal oxidizer); and[48]

e. Timelines for the implementation of the above conditions.

94. As an additional condition of the Consent Administrative Order, Baxter Healthcare was required to submit quarterly reports to the ARDEQ describing the progress in implementing the Work Plan.

---

[48] ARDEQ required Baxter Healthcare to submit a Monitoring Plan to demonstrate how it would ensure it was sufficiently controlling emissions at the Industrial Plant. In its monthly reporting, Baxter Healthcare advised its emissions were "well controlled" and being monitored. In its November 2020 Monitoring Plan Data Report, however, Baxter Healthcare disclosed its data collection for one of its emission systems to allegedly control emissions from the medical sterilization chamber "malfunctioned" and thus was missing data. In December 2020, again, Baxter Healthcare disclosed it was missing data from one of its emission control systems because of a "malfunction." Yet, again, in January 2021, Baxter Healthcare disclosed it was missing data from one of its emission control systems because of a "malfunction."

95. Further, Baxter Healthcare was required to implement a Continuous Emissions Monitoring System ("CEMS") on all final exhaust stack sources controlling EtO.

96. As the below screenshot from the EPA compliance database shows, since April 2020, Baxter's Industrial Plant has had ten fiscal quarters out of the last twelve with "Significant Violations" of the Clean Air Act, and its current compliance status with the EPA is "High Priority Violation."



| | | | | QTR 1 | QTR 2 | QTR 3 | QTR 4 | QTR 5 | QTR 6 | QTR 7 | QTR 8 | QTR 9 | QTR 10 | QTR 11 | QTR 12+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statute | Program/Pollutant/Violation Type | | | | | | | | | | | | | | |
| | CAA (Source ID: AR000000050050002) | | | 10/01-12/31/19 | 01/01-03/31/20 | 04/01-06/30/20 | 07/01-09/30/20 | 10/01-12/31/20 | 01/01-03/31/21 | 04/01-06/30/21 | 07/01-09/30/21 | 10/01-12/31/21 | 01/01-03/31/22 | 04/01-06/30/22 | 07/01-09/30/22 |
| | Facility-Level Status | | | No Violation Identified | No Violation Identified | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation | High Priority Violation |
| | HPV History | | | | | Unaddressed-State | Unaddressed-State | Unaddressed-State | Unaddressed-State | Addressed-State | Addressed-State | Addressed-State | Addressed-State | Addressed-State | Addressed-State |
| | Violation Type | Agency | Programs | Pollutants | | | | | | | | | | | | |
| CAA | HPV | AR | CAAMACT, CAASIP | Ethylene oxide | | | 06/24/2020 | → | → | → | → | → | → | → | → | → |

97. Two months after Baxter Healthcare entered into its Monitoring Agreement with the ARDEQ, the ARDEQ conducted an inspection and evaluation of the Industrial Plant. The ARDEQ spelled out its findings in a letter to Baxter Healthcare dated August 17, 2022 and determined the following:

    a. Baxter Healthcare exceeded its EtO emission rate on August 15, 2021 and September 16, 2021;

    b. After an incident at the Industrial Plant, Baxter Healthcare had an uncontrolled release of EtO into the atmosphere at a rate of 6 pounds per hour[49];

    c. Baxter Healthcare failed to demonstrate the implementation of controls that achieve 99.9% destruction efficiency of EtO;

---

[49] Baxter Healthcare's permitted emission rate was 0.68 pounds per hour. Baxter Healthcare exceeded this amount by almost ten times.

     d.  Baxter Healthcare installed and operated seventeen (17) exhaust vents, nine (9) passive air intake vents in the sterilization chambers, and two (2) fire pump engines without a permit;

     e.  The Industrial Plant had additional, uncontrolled fugitive EtO emissions; and

     f.  Baxter Healthcare submitted an upset condition report on January 28, 2022 for an upset condition that occurred on January 21, 2022, which stated that the temporary thermal oxidizers failed to meet minimum permitted temperature for 232 minutes on January 21, 2021, thus exceeding EtO emission limits.

98. As a result, Baxter Healthcare is subject to further, formal enforcement by the ARDEQ. For example, in August 2022, ARDEQ sent Baxter Healthcare an Amended Consent Administrative Order that requires Baxter Healthcare to conduct further monitoring and testing of its alleged emission mitigation and its EtO emissions.

99. In its 2020 Corporate Responsibility Report, Baxter International devoted a small paragraph to state, "Baxter has reduced emissions of hazardous air pollutants significantly during the last several decades as it has been an area of focus since 1988. In 2020, as part of our continuing environmental compliance efforts, we commenced a detailed verification process of air emissions at our manufacturing facilities and are evaluating and implementing upgrades to decrease emissions further."[50] These representations about allegedly reduced emissions and being an "area of focus since

---

[50] *2020 Corporate Responsibility Report*, Baxter International Inc., at 12, https://www.baxter.com/sites/g/files/ebysai746/files/2021-07/Baxter_2020_Corporate_Responsibility_Report.pdf.

1988" are false as previously cited emissions data demonstrate.[51] Instead of reducing emissions from its Industrial Plant, Baxter Healthcare increased emissions, including every year from 2014 to 2019.

100. There are further reasons to believe Baxter Healthcare's reported emissions do not tell the whole story. For example:

a.  The 2021 Consent Administrative Order further revealed Baxter Healthcare had *additional* EtO emissions that were not accounted for in its permit with the ARDEQ. Rather, since at least 2016, Baxter Healthcare was simply reporting some of its emissions as fugitive emissions.[52]

b.  Baxter Healthcare has admitted it has further emissions from indoor areas, including the areas between the sterilization chambers and aeration rooms that were not currently regulated.[53] In August 2020, Baxter Healthcare reported it would add an additional 1,400 pounds a year of fugitive EtO emissions that were not previously accounted for. Thus, even Baxter Healthcare's reported fugitive emissions are understated.

101. Even in the face of Baxter Healthcare's purported efforts to reduce its emissions, Baxter Healthcare has maintained it does not believe its EtO emissions are putting Mountain Home's citizens at risk of developing cancer. Rather, Baxter Healthcare believes there are "some different opinions among health agencies, scientists, et cetera

---

[51] Supra at ¶ 75.

[52] *See* May 6, 2021 Consent Administrative Order at ¶ 29.

[53] *Id.*

about whether environmental exposure of this nature presents any risks to human health."[54]

## VI.    The National Air Toxics Assessment Confirms Baxter Has Created Excess Cancer Risk Surrounding the Mountain Home Industrial Plant

102. The National Air Toxics Assessment ("NATA") is part of the EPA's analysis of substances regulated under the CAA. It provides an estimate of cancer risk from breathing air toxins over many years.

103. In 2018, EPA released the results of its analysis based on medical sterilization facilities' self-reported 2014 emissions data. That analysis revealed an increased risk of cancer around the Industrial Plant because of Baxter's Industrial Plant's EtO emissions. EPA reported the Industrial Plant provided an excess cancer risk of 50.11 per million people.

104. In calculating this risk, EPA relied on Baxter Healthcare's self-reported emissions from 2014 of 0.475 tons, or 950 pounds. This amount was based on the Toxic Release Inventory ("TRI") and woefully understated the actual risk from Baxter Healthcare's emissions. First, 950 pounds per year is among the lowest amounts of Baxter Healthcare's self-reported emissions. In 1990, for example, Baxter Healthcare reported it emitted more than **110 times** that amount, or 111,300 pounds of EtO. Thus, EPA's analysis significantly understated the risk from EtO emissions. This bears repeating, even when Baxter

---

[54] *North Arkansas facility reduces toxic gas emissions following elevated cancer risk estimates*, Arkansas Democrat Gazette, Mar. 21, 2022.

Healthcare minimally reported 950 pounds of EtO emitted from the Industrial Plant each year, EPA found an increased risk of cancer. That risk was more than 100x higher in preceding years.

105. In 2017, EPA revamped its analysis and released the AirTox Screen map. Rather than relying on self-reported data from the TRI, EPA modeled emissions based on facilities' data and accounted for alleged control apparatus, *i.e.* alleged efforts to control EtO emissions.[55] The AirTox Screen map for 2017, based on 2017 emissions, found the Industrial Plant had a risk of 242.8 cancer cases out of one million people. This is almost three times EPA's allowable risk. The AirTox Screen map for 2018 reported excess cancer risk around the Industrial Plant was an additional 52.91 cancers per million.

106. Similar to the 2014 NATA analysis, these risks are understated. As described above, Baxter's controls are still insufficient. In fact, Baxter's own testing found it had exceeded its allowed emissions by up to 11 times. Thus, assuming Baxter's mitigation efforts are as effective as Baxter Healthcare has reported, which is highly suspect, bystanders' risk from the EtO emitted by the Industrial Plant are still understated. And, worse, before 2020, neither Baxter Healthcare nor Baxter International had not invested sufficient funds to attempt to control its EtO emissions.

---

[55] *See* AirTox Screen Frequently Asked Question, "What improvements did EPA make in the 2018 AirTox Screen?", accessed at https://www.epa.gov/AirToxScreen/airtoxscreen-frequent-questions (last visited Oct. 1, 2022).

107. Baxter Healthcare claims "in light of the NATA and potential revised standards,[56]" it has "voluntarily committed to reduce and monitor EtO emissions."[57] As outlined above, however, Baxter Healthcare has most recently been issued "High Priority" violations and when testing its emissions, found violations and additional sources of uncontrolled emissions.

## VII.  The Mountain Home Industrial Plant is Surrounded by Innocent Bystanders

108. The Mountain Home Industrial Plant is surrounded by residential homes. The EPA reports there are approximately 3,000 people and 1,500 housing units within one mile of the Industrial Plant; 15,000 people and 8,000 housing units within three miles of the Industrial Plant; and more than 22,000 people and 11,000 housing units within five miles of the Industrial Plant.

109. Mountain Home's only elementary school, Nelson-Wilks-Herron Elementary, is approximately one mile from the Mountain Home Industrial Plant.

110. Mountain Home's only kindergarten school, middle school, junior high school, and high school are located within approximately three miles of the Mountain Home Industrial Plant.

---

[56] As described above, on December 12, 2019, EPA released advanced notice of potential rulemaking to revise EtO emissions standards. EPA continues to work on these rules and has indicated it anticipates releasing updated rules soon. EPA is also working to update its requirements to mitigate EtO emissions. Further rulemaking is forthcoming as well.

[57] *See* May 6, 2021 Consent Administrative Order at p. 16, ¶ 5.

111. Further, across the street from the Industrial Plant there are three churches, multiple doctors' offices, and a dental office.

112. The EPA estimated the lifetime cancer risk due to toxic air pollutants near the Industrial Plant to be three times higher than the EPA's upper limit of acceptable risk, using data from 2017. The risk for this area was driven primarily by EtO emissions from the Industrial Plant, according to the agency's 2017 Air Toxics Screening Assessment.[58]

113. Thus, Baxter has knowingly exposed thousands of innocent citizens, including its youngest children, to cancer causing EtO where they live, work, and even where they worship.

## VIII.   Plaintiffs' Exposure to Ethylene Oxide

114. For more than three decades, Plaintiffs have lived within close proximity of the Mountain Home Industrial Plant.

115. In 1988, when Plaintiffs were both 32 years old, they moved to Mountain Home, Arkansas.

116. From approximately 1988 to 1991, Plaintiffs lived approximately 3,200 feet away from the Mountain Home Industrial Plant. During that time, Baxter Healthcare reported

---

[58] Will Langhorne, *North Arkansas facility reduces toxic gas emissions following elevated cancer risk estimates*, Ark. Democrat Gazette (Mar. 21, 2022), https://www.arkansasonline.com/news/2022/mar/21/north-arkansas-facility-reduces-toxic-gas/.

it emitted more than 309,000 pounds of EtO into the air surrounding the Mountain Home Industrial Plant.

117. From approximately 1992 to the present, Plaintiffs have lived approximately 4,000 feet away from the Mountain Home Industrial Plant. During that time, Baxter Healthcare reported it emitted more than 215,000 pounds of EtO into the air surrounding the Mountain Home Industrial Plant.

118. For more than three decades, Plaintiffs have resided together no farther than approximately 4,000 feet away, less than one mile, from the Mountain Home Industrial Plant that reported it has emitted more than 525,000 pounds of cancer causing EtO.

119. Plaintiffs consistently, and without any knowledge, inhaled toxic levels of EtO in and around their home, their places of work, and in Mountain Home generally.

120. As a result of this exposure, plaintiff Dr. John Spore was diagnosed with multiple myeloma in 2022.

121. At the time of his diagnosis, plaintiff Dr. John Spore was neither on notice nor aware that he had been inhaling toxic levels of EtO for decades.

CAUSES OF ACTION

**Count I:   Negligence (On behalf of Plaintiff Dr. John Spore)**

122. Plaintiffs re-allege each paragraph as if fully set forth herein.

123. Defendants had a duty to exercise reasonable care in the management and operation of the Mountain Home Industrial Plant, including testing of EtO emissions,

mitigation of EtO emissions, use of EtO in the sterilization process, and emission of EtO, including a duty to ensure that their use of EtO would not cause those exposed to it to suffer unreasonably dangerous side effects.

124. Defendants failed to exercise reasonable care in the testing of EtO emissions, mitigation of EtO emissions, use of EtO, and emissions of EtO in that Defendants knew or should have known that their emissions of EtO would result in exposures to EtO by innocent bystanders, resulting in a high risk of unreasonably dangerous side effects, including, but not limited to, cancer.

125. Defendants' negligence included, but was not limited to, the following acts and/or omissions:

  a. Emitting EtO into the air from the Industrial Plant;

  b. Emitting dangerous and/or excessive amounts of EtO from the Industrial Plant;

  c. Failing to exercise reasonable care in the emission of EtO from the Industrial Plant;

  d. Failing to adopt, implement, and/or enforce reasonable and sufficient measures to mitigate or reduce emissions of EtO from the Industrial Plant to non-harmful levels;

  e. Failing to adequately track, record, and/or monitor the amounts or levels of emissions of EtO from the Industrial Plant;

  f. Failing to adequately track, record, and/or monitor the amount of EtO present in the air surrounding the Industrial Plant;

  g. Failing to adequately, accurately, and thoroughly report the levels of EtO being emitted from the Industrial Plant;

     h.   Failing to report fugitive emissions of EtO;

     i.   Failing to select and utilize safer, alternative methods to sterilize medical devices at the Industrial Plant;

     j.   Failing to investigate or study safer, alternative methods to sterilize medical devices at the Industrial Plant;

     k.   Concealing from the public the nature and extent of EtO emissions from the Industrial Plant;

     l.   Failing to warn Plaintiffs and others who live and work in the surrounding community that they were being exposed to EtO; and

     m.   Failing to provide adequate cautions and warnings to protect the health of Plaintiffs and those who would reasonably and foreseeably be exposed to EtO.

126. Defendants knew or should have known members of the public, including Plaintiffs, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable care.

127. As a direct and proximate result of the aforementioned negligence, plaintiff Dr. John Spore suffered injuries that are permanent and lasting in nature, including physical disability, mental anguish, diminished enjoyment of life, and loss of income, as well as financial expenses for hospitalization and medical care.

**WHEREFORE**, plaintiff Dr. John Spore respectfully requests this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

**Count II: Loss of Consortium (On behalf of Plaintiff Cheryl Spore)**

128. Plaintiffs re-allege each paragraph as if fully set forth herein.

129. As a proximate result of the wrongful and tortuous acts of Defendants, plaintiff Cheryl Spore has suffered the loss of affection, society, comfort, support, consortium, and companionship of her husband, Dr. John Spore.

130. Defendants' wrongful conduct as alleged herein was the proximate cause of the damages suffered by plaintiff Cheryl Spore and has caused Ms. Spore to incur damages in an amount to be proven at trial equal to the loss of affection, society, comfort, support, consortium, and companionship of her husband.

**WHEREFORE**, plaintiff respectfully requests this Court enter judgment in plaintiff Cheryl Spore's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury as to all issues

Dated: January 6, 2023               Respectfully submitted,

**PAUL LLP**
*/s/ Laura C. Fellows*
Laura C. Fellows, AR Bar No. 2015104
Ashlea G. Schwarz, Bar No. 60102MO
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Laura@PaulLLP.com
Ashlea@PaulLLP.com

**ATTORNEYS FOR PLAINTIFFS**